FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 APR 27 AM 9: 21

U.S. DISTRICT COURT
N.D. OF ALABAMA

BARNETTA JOHNSON,                        )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )   CIVIL ACTION NO. 96-JEO-2680-S
                                         )
INTERIM HEALTH CARE, INC.,               )
                                         )
          Defendant.                     )

ENTERED

APR 27 1999

## MEMORANDUM OPINION

Plaintiff Barnetta Johnson ("Johnson"), asserts in this action that defendant Interim Health

Care, Inc. ("Interim") illegally discriminated against her because of her race in failing to pay her in

an amount equal to other white employees and in retaliating against her for filing a claim with the

Equal Employment Opportunity Commission, in violation of Title VII of the Civil Rights Act of

1964 as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981.

This action was commenced when the plaintiff filed a pro se complaint on July 5, 1996. On

February 3, 1997, counsel was appointed to investigate the plaintiff's claim. (Doct. 9). Counsel filed

an amended complaint on March 18, 1997. (Doct. 11). Presently before the court is the defendant's

motion for summary judgment as to all the plaintiff's claims. (Doct. 16). A hearing on the motion

was conducted on November 5, 1998. At the hearing, and in his pleadings, counsel for the plaintiff

informed the court that the plaintiff was proceeding on a claim of disparate treatment due to the pay

disparities between the plaintiff and other similarly situated white employees and on a claim of

retaliation.

On December 18, 1998, the court requested that the parties submit documentation clarifying

Interim's corporate management structure in the Birmingham office during the period preceding

32

Johnson's filing of her charge of discrimination with the Equal Employment Opportunity Commission (EEOC), which is the basis of the present lawsuit. (Doct. 24).

Upon consideration of all the evidentiary submissions and the arguments of counsel, the court finds that the defendant's motion for summary judgment is due to be granted in part and denied in part.

## I. BACKGROUND

### A. Barnetta Johnson

Johnson began working for Interim on September 28, 1992, as a part-time private duty nurse. (Johnson Depo., pp. 41-46; Ex. 3). She initially provided health care for patients who needed attention in their homes. Interim is involved in the health care business and is divided into two divisions, the proprietary side and the home health care side. Interim offered and the plaintiff accepted a full-time position in March 1993 on the home health side of the business. She was paid $25.00 per patient visit. She received company benefits that included insurance, paid vacations, and preferential choice of patients. When she worked the proprietary side of the business, she was paid $16.00 per hour.

Johnson was promoted to Home Health Aide Supervisor on August 30, 1993, by Kathleen Spencer, the administrator of Interim's Birmingham location. (Doct. 15, Johnson Depo., p. 66). This is the lowest managerial position with Interim. (Doct. 15, Thrower Decl., p. 1). Johnson was responsible only for the supervision of the home health aides. (*Id.*). Her initial pay was $17.00 per hour. It was subsequently raised to $18.25. She supervised eight aides when she started. (Johnson Depo., pp. 95-96). She accepted the position because she had high blood pressure attributable to diabetes.

2

She worked well with Spencer in the beginning. However, after a while, problems arose. According to Johnson, Spencer would tell her one thing and then not follow-up. (Johnson Depo., p. 63). Spencer also denied her vacation time Johnson believed she was due. This was corrected by the owner of the company around Christmas 1993 when Johnson complained. (Johnson Depo., pp. 67-69). Johnson perceived that Spencer was vindictive. By way of example, Johnson noted that Spencer prohibited Johnson from calling Interim's corporate office. (Johnson Depo., p. 70). Johnson was not sure whether Spencer restricted other employees in the same way. (Johnson Depo., pp. 70-72). Johnson had trouble communicating with Spencer. (Johnson Depo., p. 148). On one occasion, Spencer told Johnson that "there have been several people who tried to get [her] job," and "they're no longer here." (Johnson Depo., p. 78).[1]

By January 1995, Interim's Birmingham office staff was structured as depicted below:



(Doct. 25, p. 3, January 8, 1999 submission). Johnson's immediate supervisor was Virginia Branson. The chart also shows the race and sex of each individual and their hourly wage.

On March 6, 1995, Branson counseled Johnson concerning an incident that occurred on February 24, 1995, when Johnson attempted to block the assignment by another supervisor of an

_____

[1] Johnson also notes that she did not get a number of positions she would have wanted at Interim. (Johnson Depo., pp. 150-153). These claims were not presented to the EEOC and are not a part of the present suit. She also made other allegations that relate back to 1993. She stated, however, that these are also not part of her present claim. (Johnson Depo., p. 95).

3

improperly trained registered nurse ("RN") who was scheduled to go out on a home visit. The nurse

went out on the visit and the family and the insurance company complained. (Johnson Depo., Ex.

25, p. 2, 26). Johnson received a written reprimand for being inappropriately loud with another

employee. She later apologized to the employee. (Johnson Depo., pp. 188-93). According to

Johnson, Spencer instructed Branson to write her up for the incident. (Johnson Depo., Ex. 25, p. 3).

During April 1995, employees at Interim received their pay checks that included their most

recent raises. Johnson did not receive any increase in her pay check. She brought the matter to the

attention of Branson who discussed it with Spencer. After that conversation, Johnson received her

pay raise. (Johnson Depo., pp. 187-88, Ex. 25, p. 3). After the salary increases, the pertinent

individuals in the Birmingham office were receiving the hourly wages listed below for each position:



(Doct. 25, p. 4, January 8, 1999 submission).

In about April or May 1995, Johnson was informed that her job was going to be eliminated

as the company was changing its health care approach. (Johnson Depo., p. 243). Interim was going

to use a team approach. The teams would be comprised of a professional nurse (RN), nursing aides,

a physical therapist, a social worker, and possibly a speech pathologist, all working in the same area.

(Johnson Depo., pp. 105-06, 245). Johnson was concerned about her future with the company even

though she had been told that she would be laterally transferred. (Johnson Depo., pp. 243-44). She

was never told that she would be fired. (Johnson Depo., p. 246).

4

According to Johnson, on September 15, 1995, Spencer was talking with her. Spencer became abusive during the discussion. She accused Johnson of "'bad mouthing' Ginger [Branson], [her] supervisor and calling the nurses at home." (Johnson Depo., Ex. 25, p. 3). Johnson denied the claims. Spencer then accused her of lying and stated that she did not have to put up with Johnson's "damn shit." (Johnson Depo., pp. 77-79, 197, Ex. 25, p. 3).

Johnson filed a charge of discrimination with the EEOC on September 18, 1995. She claimed that she had been improperly reprimanded, her pay increase delayed, she was treated unfavorably, and she was paid less than similarly situated white employees. (Johnson Depo., Ex. 25). This claim was premised on the actions of Spencer. (Johnson Deposition, pp. 147, 215). She specifically stated that white employees with less responsibilities were paid more money. She named Alan Emig, Ray Killingback, Martha May, Joan White, Jackie Dicey, and Debbie Barge as examples of employees who were similarly situated, but making more money. (Johnson Depo., Ex. 25, p. 4).

After the EEOC complaint, Johnson felt like people, including managers Ray Killingback and Joan Witt, would not communicate with her unless it was regarding an aide. (Johnson Depo., pp. 137, 267-68). According to Johnson, someone broke into her desk drawer and a cabinet. (Johnson Depo., p. 137).

Spencer left Interim at the end of September 1995.[2] Her "confrontational" management style "irritated and antagonized all of her subordinates" to the point that she was terminated because Interim deemed her actions "disruptive." (Thrower Decl., ¶ 4). When she was terminated, Killingback was promoted to Administrator of the Birmingham facilities. (*Id.*). The Birmingham

---

[2] According to Interim's Human Resource Manager, Spencer was terminated within ten days of Johnson filing the first EEOC charge. (Thrower Decl., ¶ 8). Johnson's recollection is that the date was September 25, 1995. (Johnson Depo., p. 215).

office was restructured as depicted below:



(Doct. 25, p. 5, January 8, 1999 submission).

On October 6, 1995, counsel for Johnson contacted Interim's Chief Operating Officer concerning the possibility of resolving the EEOC charge. (Johnson Depo., Ex. 27). Communications between the parties' counsel continued through December 6, 1995. (Johnson Depo., Ex. 28-31).

At a "Management Team" meeting during the week of October 16, 1995, Johnson inquired as to her future status with Interim. She was informed that when the home care supervisors were in place, her home health aide supervisor position was going to be eliminated. (Johnson Depo., p. 247, Ex. 37). She was told that she would be eligible to apply for the home care supervisor positions that would be filled. (Johnson Depo., p. 248, Ex. 37). By this time, she was supervising approximately 25 aides. (Johnson Depo., p. 209). She had been receiving good performance evaluations over the last couple of years. (Johnson Depo., p. 164, 168, 175-77, Ex. 15, 16, 18, 21, 22, 24).

The general summary in the job description for the home care supervisor positions that were available after the reorganization provides that the individual occupying the position would have the "prime responsibility in assuring quality patient care and service to home health clients." (Johnson Depo., Ex. 39). Killingback was in charge of the interview process. Johnson interviewed twice for the positions. (Johnson Depo., pp. 104-06). According to Johnson, she was feeling paranoid about that time, especially when she did not get either of the positions. (Johnson Depo., pp. 106-107). She

interviewed the first time for the positions in October. At the time, there were three or four applicants. (Johnson Depo., pp. 262-63). The positions were not immediately filled.

Johnson was diagnosed with general depression on October 27, 1995. (Johnson Depo., p. 99). The second round of interviews were conducted on November 29, 1995. (Johnson Depo., Ex. 43). There were two additional candidates from outside the company at that time. (Johnson Depo., p. 264). The interviews were conducted by panels comprised of personnel from Interim. Johnson was concerned that one of the panel members, Virginia Williams, was biased against her.[3] When Johnson made this known, she was told panels were being used to avoid any potential bias. (Johnson Depo., Ex. 43). She was offered the opportunity to interview or withdraw her name. (Johnson Depo., Ex. 43). Her anger over the situation was noted by Joan Witt, a RN and Director of Facility Services. (Johnson Depo., Ex. 44).[4] She decided to interview for the positions. The positions were awarded on December 6, 1995. (Johnson Depo., Ex. 51). Johnson was not offered either position, but was offered a field staff management position with a raise. (Johnson Depo., pp. 57, 272, 285).[5]

The plaintiff did not show up for work first thing on December 6, 1995. Her desk had been cleared of personal items. She told another employee the evening before that she was not going to be returning in the morning. (Johnson Depo., Ex. 47). She arrived a little later. Joan Witt held a meeting for the aides about 1:00 p.m. to discuss Interim's new approach, including the team concept and the new home care supervisor positions. The plaintiff attended the meeting and complained that

---

[3] Williams is a black employee that Johnson deemed to be a friend of Spencer. (Johnson Depo., p. 91). She is also an employee that Johnson complained was making more than her. (*Id.*, p. 266).

[4] Johnson contests this assessment and asserts that she was not angry. (Johnson Depo., p. 271).

[5] In a settlement letter from counsel for Interim to the plaintiff's counsel dated November 30, 1995, the company stated that it was willing to increase her salary to $19.25 (a one dollar increase). (Johnson Depo., Ex. 30, pp. 2-3). This offer was withdrawn approximately a week later on December 6, 1996. (Johnson Depo., Ex 31).

7

there were no aides from the Medicare side of the company involved in the interview process. Otherwise, she stated that the process was "good" and "well balanced." (Johnson Depo., Ex. 49).

On December 8, 1995, one of the company directors, Peggy Cook, wanted to talk with Johnson regarding her situation. (Johnson Depo., pp. 136, 276-81). Johnson asked her why, as she was "not going to be working [t]here." (Johnson Depo., p. 136). Johnson did go to Ray Killingback's office to talk with Cook and Killingback. They discussed the new position as a manager outside the office that she had been offered and what was expected of her. At the end of the conversation, Cook asked Johnson if she was going to quit. Johnson said she was not. (Johnson Depo., p. 136). Johnson states that Cook told her she wanted her out of the office. (Johnson Depo., p. 138). Johnson acknowledged at the deposition that she was "out of control" that day. (Johnson Depo., p. 279). She attributes her conduct to her illness. (Id.). She also states that it was precipitated by another event that occurred prior to the meeting. That event was Spencer telling her that her curly hair style was not acceptable for marketing purposes and that she could go into petty cash to buy a wig with straight hair. (Johnson Depo., pp. 139-40). Johnson does not state when this event occurred.[6]

On December 11, 1995, Johnson requested leave from that date until about March 11, 1996.[7] Her leave was approved by the administrator that day. (Johnson Depo., p. 108, Ex. 4). She was hospitalized the next day. (Id., p. 126). Her employment was terminated on April 18, 1996. (Id., Ex. 10). Without medication and therapy, Johnson believes that her depression would return. (Johnson

---

[6] Because Spencer left around September 25, 1995, the event must have occurred over two months earlier.

[7] Johnson states that when she requested leave, she was receiving medication for depression as she was diagnosed as having homicidal and suicidal tendencies. (Johnson Depo., pp. 111, 118, 120). On March 28, 1996, her treating physician prepared a letter for Valarie Thrower, Human Resource Specialist, indicating that Johnson had been receiving medication and therapy on a regular basis. He also stated "that the strain of returning to work at [that] time could result in decompensation and more intensive interventions. Therefore, a medial leave of absence from work is indefinite." (Johnson Depo., Ex. 9)

8

Depo., p. 112).[8]

Johnson filed a second discrimination charge with the EEOC on April 4, 1996. This charge
alleges that Interim retaliated against her for filing the earlier EEOC charge by not offering her one
of the home care supervisor positions that were filled in December 1995. (Johnson Depo., pp. 282-
83, Ex. 51).

On July 18, 1996, Interim received a fax from Johnson accusing the company of harassment
and other improper business practices. (Johnson Depo., pp. 285-88, Ex. 52).

### B. Comparators

#### 1. Alan Emig

Alan Emig was an Interim employee that worked at the Birmingham location. He was the
home care supervisor. (Johnson Depo., Ex. 66). He was responsible for supervising RNs that
provided medical treatment for the patients. He did make slightly more than Johnson.[9] (Thrower
Decl., ¶ 9; Doct. 25, pp. 3- 4). He is white. Johnson acknowledges that Emig's job supervising RNs
required more qualifications than supervising the aides and LPNs that she was responsible for.
(Johnson Depo., p. 207; Brief, p. 3, n.3). She further acknowledges that there was a justification for
his being paid more than her. (Johnson Depo., p. 230).

#### 2. Martha May

Martha May was another Interim Birmingham employee. She held various positions at
Interim, including the director of professional services. (Johnson Depo., p. 149; Doct. 25, p. 3). She

---

[8] At the deposition, Johnson stated that she was still having some bad days  (Johnson Depo., pp. 112-13)  There is no
dispute that Johnson is not in a position to return to work.

[9] In January 1995, when Johnson was making $17.70 as the Home Health Aide Supervisor, Emig was making $20 20
as a Home Care Supervisor. (Doct. 25, p. 3 ). In September 1995, when Emig was making $20.85, Johnson was making $18.25.
(*Id.*, p. 4 )

was one supervisory level above Emig and Johnson. (*Id.*). May was responsible for numerous functions and programs involving both the nursing staff and the nursing aides. (Doct. 27, pp. 5-8). She was paid more money than Johnson.[10] She is white. (Doct. 25, p. 3).

### 3. Debbie Barge

Debbie Barge was an Interim employee that worked at the Mount Royal Nursing Home located in the Brookwood Medical Center Complex. (Doct. 19). The Interim organizational chart shows that her title was "On-premise Manager." (Doct. 25, p. 3). According to Johnson, she was a supervisor of the aides that worked at that location. Johnson states that she supervised only ten persons at that one location. (Doct. 19). She was white and was paid more than Johnson.[11] (Johnson Depo., p. 212; Doct. 25, p. 3). The critical factors assessment for her position demonstrates that, unlike Johnson, she had responsibilities over the nursing staff, as well as the aides. (Doct. 27, pp. 9-11).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that

---

[10] In January 1995, when Johnson was making $17.70, May was making $19.25, as the Director of Professional Services. (Doct. 25, p. 3). May is not listed as a supervisor on the September organizational charts. (*Id.*, pp. 4-5).

[11] In January 1995, Barge was paid $21.25, as "On-premise Manager" when Johnson was paid $17.70. (Doct. 25, p. 3). In September 1995, Barge was paid $21.25 when Johnson was paid $18.25.

should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see Fed. R. Civ. P.* 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and

11

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

12

## III. *MCDONNEL DOUGLAS* ANALYSIS

### A. Generally

The Supreme Court's disparate treatment cases, such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), provide the appropriate starting point for evaluating the plaintiff's Title VII claims. The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in employment cases under 42 U.S.C. § 1981. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). Under the applicable standard in a case like this, where the claims are premised upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination.[12] *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253-54 & n.6; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir.), *cert. denied*, ___ U.S. ___, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997). Once the plaintiff establishes a prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254; *Combs*, 106 F.3d at 1528. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S.

---

[12] Johnson asserts that there is direct evidence of discrimination in that Spencer told her that her curly hair was not acceptable and she should go to petty cash for money to buy a wig. She contends that this is a racially motivated comment, for it is "an attempt to temper her ethnic appearance," and therefore direct evidence of discrimination. (Plaintiff's Brief, p. 4). The court disagrees. This evidence does not constitute such a blatant remark that there can be no other intent other than to discriminate. *Early v. Champion Int'l. Co.*, 907 F. 2d 1077, 1082 (11th Cir. 1990).

at 254-55).

Once the employer meets its burden of production, "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993); *see also Burdine*, 450 U.S. at 255 & n.10, leaving the elements of the prima facie case. *Combs*, 106 F.3d at 1528. When those elements are accompanied by evidence of pretext or disbelief of the defendant's proffered explanation, they may permit, in some instances, a finding for the plaintiff. *Id.* at 1529; *see also Hicks*, 509 U.S. at 511, *Evans*, 131 F.3d at 963. The plaintiff, however, always retains the ultimate burden of proving that he was the victim of intentional discrimination. *Hicks*, 509 U.S. at 508; *Burdine*, 450 U.S. at 253.

The court's task in deciding the defendant's motion for summary judgment is limited. The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.... The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (citations omitted).

## B. Application of *McDonnell Douglas*

### 1. The pay claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

14

individual's race...."  42 U.S.C. § 2000e(a)(1). In order to make a prima facie showing on the disparate pay claim under *McDonnell Douglas*, the plaintiff must demonstrate that (1) she belongs to a racial minority and (2) she was paid less than non-minority employees performing substantially similar work. *See Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 598 (11th Cir.), *cert. denied*, 513 U.S. 919 (1994);  *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997). The "similarity" requirement for the plaintiff is relaxed in Title VII cases and the defendant's burden in rebutting the prima facie case is "exceedingly light." *Mulhall*, 19 F.3d at 598.

The first element is not contested. Interim does, however, contest the second element, asserting that Johnson has failed to point to a similarly situated, non-minority employee who was treated more favorably than her. Interim also states that she has failed to rebut their showing of a legitimate, non-discriminatory reason for the pay differences. *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995). To allow a comparison of her treatment to that of non-minority employees, she must show that she and the other employees are similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994), *cert. denied*, 514 U.S. 1108 (1995); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985), *cert. denied*, 475 U.S. 1050, 106 S. Ct. 1273, 89 L. Ed.2d 581 (1986).

As the defendant has also submitted legitimate, non-discriminatory reasons for the pay distinctions, the plaintiff must produce evidence sufficient to discredit in the mind of a reasonable juror the defendant's proffered nondiscriminatory reasons for its actions. *Combs*, 106 F.3d at 1543.

For comparison purposes, Johnson initially asserted that Emig, May, and Barge were

similarly situated white employees that made more than her.[13] At the hearing on the motion, her counsel acknowledged that Emig was not an appropriate person for comparison. The record reveals that counsel is correct. Emig is not an appropriate comparator. Unlike Johnson, who supervised the non-professional aides that do not make clinical/medical decisions concerning the patient, he supervised the professional nurses who are responsible for clinical decisions and the patients they are providing medical treatment. (Johnson Depo., Ex. 38 & 39). Johnson recognized the distinction in her deposition when she stated that Emig's supervision of the nursing staff, RNs and licenced practical nurses, required greater qualifications. (Johnson Depo., pp. 207-08, 229-30; Plaintiff's Brief, p. 3, n.3).

May is also an inappropriate person for comparison. She was one level higher on the supervisory structure of Interim than Johnson. May was on the level of Johnson's supervisor, Virginia Branson. (Doct. 25, p. 3). She was also the Director of Professional Services which included supervision of the nursing (RN) staff. May was Emig's supervisor. May's responsibilities were much boarder in scope than Johnson's. Johnson's work was limited to the supervision and coordination of the home health aides while May's responsibilities included duties throughout the Birmingham office. (Doct. 27, pp. 3-7). For instance, May was responsible for seeing that "all office and clinical functions operate in accordance with federal, state, local laws, and accreditation standards." (Doct. 27, p. 5). If Emig is not a comparator, May, as his supervisor with additional responsibilities, is also not an appropriate comparator.

Barge is also not an appropriate person for comparison. Although she appears to have

---

[13] Johnson lists other individuals for comparison purposes in her deposition and with the EEOC. (Johnson Depo., Ex. 25, p. 4). Counsel has chosen, however, to advance only three individuals for comparison in this action. (Plaintiff's Brief, pp. 3-4).

16

supervised less people than Johnson on a daily basis, her responsibilities were more far reaching in scope and, like Emig and May, included supervision of not only aides, but the nursing personnel as well.[14] The court finds this distinction significant. (Doct. 19, Doct. 27, pp. 9-11).

The plaintiff has failed to satisfy the second element of a prima facie case by demonstrating that her comparators performed substantially similar work. Even had she met this relaxed standard, she has not sufficiently discredited Interim's proffered nondiscriminatory reasons for the pay differences to defeat its motion for summary judgment.

As the defendant has proffered its submitted legitimate, non-discriminatory reasons for the pay distinctions, the plaintiff must produce evidence sufficient to discredit in the mind of a reasonable juror the defendant's proffered nondiscriminatory reasons for its actions. *Combs*, 106 F.3d at 1543. However, Johnson's arguments that defendant's asserted legitimate, nondiscriminatory reasons are pretextual are not sufficient to meet this standard.

### 2. Retaliation

#### A. Generally

Title VII also prohibits an employer from retaliating against an employee where the individual has engaged in a statutorily protected activity including where the person has "made a charge" under this title. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, the plaintiff need only show that (1) she engaged in statutorily protected expression, such as "making a charge" of discrimination; (2) she suffered an adverse employment action; and (3) that it is causally

---

[14] In opposition to the motion for summary judgment, the plaintiff submitted an affidavit wherein she states that Barge supervised less aides than she did. The plaintiff also states that she had to supervise the aides who were sent to clients' homes throughout Interim's service area while Barge's aides were at a single location. (Doct. 19). She does not dispute the assertion by the defendant that Barge also had supervisory responsibilities over nursing personnel, as is reflected in the corporate structure and position descriptions.

17

related to the protected expression. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Meeks v. Computer Associates Intern*, 15 F.3d 1013, 1021 (11th Cir. 1994).

### B. The Plaintiff's Claim

The first element of this claim is not contested. The plaintiff "made a charge" of discrimination with the EEOC on September 18, 1995.[15] (Johnson Depo., Ex. 25). The last two elements are contested by the defendant. (Defendant's Brief in Support of Motion, pp. 13-14). Interim appears to be asserting that there was no adverse employment action and, even if there was an adverse action, there is no causal relation between the protected activity and such action.

The substance of Johnson's retaliation claim is enumerated in paragraph seven of the amended complaint. She states:

> In 1995, Plaintiff began complaining about her salary, since it had not expanded as rapidly as her responsibilities and since it was less than that of other supervisor employees. In September 1995, Defendant's administrator, Kathleen Spencer, began harassing Plaintiff. She came into Plaintiff's office, accused her of acts of insubordination she had not committed and cursed her. Following this incident, Plaintiff filed a charge of discrimination. She was then called by Defendant's chief executive officer and asked not to proceed with her charge. On November 30, Defendant was offered an increase in salary but that offer was rescinded the next day.

(Doct. 11, ¶ 7). In her brief in opposition to the motion for summary judgment, the plaintiff asserts that Spencer was the source of the adverse actions in this case. (Doct. 30, p. 1). The plaintiff states that "once she began complaining about her salary and filed a complaint with the Equal Employment Opportunity Commission about it, she was subjected to harassment by Kathleen Spencer, the facility administrator." (Doct. 30, p. 1). She does not, however, specify the actions by Spencer that constitute retaliation. Instead, she argues in support of the disparate pay claim.

---

[15] Johnson had been gone from the company approximately seven months before the second charge was filed.

Construing the evidence presented liberally, it appears that the plaintiff's retaliation claim may be based on various events: (1) the March incident where she received a written reprimand; (2) the September 15, 1995, dialogue between the plaintiff and Spencer; (3) the defendant's inquiry of the plaintiff concerning a stolen payroll check; (4) Spencer's treatment of the plaintiff from the filing of the EEOC complaint until Spencer was terminated; and, (5) the defendant's failure to offer the plaintiff one of the home care supervisor positions on December 6, 1995.[16] The plaintiff does not base her retaliation claim on her ultimate termination.[17]

In *Wideman*, the Eleventh Circuit Court of Appeals held "that Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." 141 F.3d at 1456. To demonstrate the requisite causal relation element of the prima facie case, the plaintiff "need only show 'that the protected activity and the adverse action are not completely unrelated.'" *Id.* at 1457.

### i. The March Incident

The evidence concerning the March incident when the plaintiff was reprimanded for her inappropriate behavior with another employee is clearly not related to the protected activity in this case. It occurred approximately six months before the EEOC charge was filed and was premised on the plaintiff attempting to exercise authority over a RN who did not fall under her supervisory responsibility. She apologized to the staff for her conduct. As already noted, she was not responsible

---

[16] In her second EEOC charge that was filed April 9, 1996, Johnson claimed that her failure to receive either of the home health supervisor positions was in retaliation for filing the earlier claim. This assertion was not advanced in the complaint, in her brief in opposition to the motion for summary judgment, or at the hearing on this motion. It was, however, advanced during her deposition. (Johnson Depo., pp. 268-69).

[17] Counsel for the plaintiff has made it clear that any retaliation claim is not premised on her termination of employment with the defendant. To the contrary, counsel has stated, and the record clearly demonstrates, that the termination was due to medical considerations and was not in retaliation for filing an EEOC charge.

for the RNs and was therefore outside her designated responsibilities. Further, there is no evidence that the plaintiff had expressed an intention to anyone at Interim that she was going to file a charge with the EEOC. "In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Due to the lapse of time between the two events and the absence of evidence showing that the plaintiff had communicated to anyone that she was even considering an EEOC charge, she has not established the requisite causal link. The events are unrelated.

### ii. The September 15, 1995 Incident

The plaintiff asserts in her EEOC charge that on September 15, 1995, she walked into Spencer's office. During a conversation with Spencer, she (Spencer) became abusive. According to the plaintiff:

> Kathleen [Spencer] went on to say that she had heard several nurses say that I had been 'bad mouthing' Ginger [Branson], my supervisor and calling the nurses at home. I immediately told her that she was lying because none of that was true. Kathleen immediately stated that I come (sic) on with my lies. Kathleen went on to say that I was two faced and that she was not putting up with my 'damn shit.' I left my (o)ffice and she came behind me telling me to come back. To my knowledge this incident was not written up as a disciplinary action.

(Johnson Depo., Ex. 25, p. 3). She did not assert in her EEOC charge that any of the alleged conduct was in retaliation for exercising any protected right. Her charge was clearly based on an assertion of race discrimination due to disparate pay. When she filed her later EEOC charge of retaliation, that did not recite any of the foregoing facts in support of the claim. Instead, she asserted that the failure to award her one of the health care supervisor positions was in retaliation for filing the September

EEOC charge. (Johnson Depo., Ex. 51).

The court finds that under the circumstances, this incident will not support her prima facie case of retaliation. Specifically, there is no evidence in the record that at the time of the incident, she had informed Spencer or anyone else that she was going to file an EEOC charge. The evidence does not support an inference that, at this juncture, the defendant was aware of any protected expression by the plaintiff or that she was participating in any protected activity. Additionally, as noted by the plaintiff in her EEOC charge, there was no action taken as a result of this incident.

### iii. The Payroll Check Incident

At her deposition, the plaintiff also asserted for the first time that she believed that the defendant retaliated against her when she was approached by an Interim supervisor, David Bowersox, and asked about a missing $2,000 payroll check. (Johnson Depo., pp. 256-58). The plaintiff was not the subject of the inquiry as another employee was believed to have had the check and showed it to her (Johnson) as part of a joke, apparently telling the plaintiff that is was a bonus for her. (*Id.* at 257). The plaintiff was not accused of any wrongdoing and no action was taken against her. (*Id.* at 256-58, Ex. 40). The court finds that this incident does not meet the *Wideman* standard supporting the plaintiff's retaliation claim.

### iv. The Ten Days Between Her EEOC Charge and Spencer Leaving

During the ten days between the filing of the charge and Spencer's termination, there is no evidence of any adverse job action by Spencer or any other Interim employee against the plaintiff. Further, there is no evidence of harassment of the plaintiff. Although Johnson states in her deposition that she felt like people, including the managers, were not communicating with her unless it

21

concerned the aides, she makes no allegation that she was hampered in performing her job function in retaliation for the filing of her EEOC charge. Her general, conclusory assertions are not sufficient to support her prima facie case.[18]

To the extent her allegations center around Spencer, she states that Spencer was the subject of much conversation around the office. The other employees talked badly about her. (Johnson Depo., p. 75). Johnson stated that other employees described Spencer as follows:

> That she had Alzheimer's, kind of a Barbie doll with no brain, and she lied a lot. She'd promise you more than she would give you, you know. Really making a job miserable that could have been a good job.

(*Id.*, p. 76). When Johnson was asked at the deposition if Spencer treated blacks worse than she treated whites, she responded:

> I couldn't say that. She was just - - I can't say. It's a matter of opinion. If you're the person and you're one being treated - - mistreated, you know, I don't know. That's - - some people might like the way she - - her style.

(Johnson Depo., p. 289). Counsel recognized and conceded at the hearing on the motion that Spencer treated everyone badly, regardless of race. Johnson has not set forth a prima facie case on this claim.

#### v. The Health Care Supervisor Positions

The evidence indicates that the hiring decisions for the home care supervisor positions were made using panels and a point system. (Johnson Depo., Ex. 51, p. 2). According to the record, the panels were an attempt to avoid any bias for or against a particular person. (Johnson Depo., Ex. 43). By the time the process commenced and the decisions were made, Spencer had been terminated by

---

[18] A letter from the plaintiff's attorney to counsel for the defendant on November 3, 1995, states that after the plaintiff informed Interim's corporate office about the EEOC complaint and Spencer's conduct, Spencer accused her of "collaborating" with a terminated employee. (Johnson Depo., Ex. 29, p. 4). The plaintiff, at her deposition, confirmed this did occur. (Id, pp. 223-25). No adverse job action was taken regarding this event.

22

the defendant. Additionally, Killingback was the director of facilities at the Birmingham location. The plaintiff did not articulate any specific evidence that Killingback retaliated against her for the filing of the EEOC charge.[19] Further, nothing in the record indicates or supports a conclusion that any panel member but Killingback was aware of her filing the EEOC complaint.[20] When the decision not to select the plaintiff was made, the record indicates that she was suffering from depression, paranoia, and homicidal and suicidal tendencies. (Johnson Depo., pp. 99, 111, 118, 120).

However, because the burden on the plaintiff to show that the denial of the positions and her filing of an EEOC charge is so light, the court can not conclude that she has not set forth a prima facie case. The temporal proximity of the EEOC charge and the decision not to award the plaintiff either position and the fact that Killingback was a manager and a decision maker involved in the interviews for the positions, is sufficient.

Because the defendant has not articulated its "legitimate, nondiscriminatory reason" for not awarding one of the positions to the plaintiff, summary judgment must be denied at this juncture. *Combs*, 106 F.3d at 1528. The defendant's assertion that the plaintiff has not demonstrated that Interim's actions were pretextual, is premature as it has not proffered its explanation. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

---

[19] The plaintiff did complain that Killingback did not increase her salary to equal the other individuals she complains of in this lawsuit. (Johnson Depo., p. 270). As already discussed, there were legitimate reasons for the pay differentials. She also complains about his "attitude" during the second interview. (*Id.*, p. 269).

[20] The plaintiff did complain that Ms. Williams (see n.3 herein) was a friend of Spencer and was making more money than her. However, her concerns about Ms. Williams are collateral to her retaliation charge.

23

## IV. CONCLUSION

For the reasons stated above, defendant Interim's motion for summary judgment is due to be granted in part and denied in part with the plaintiff's claims being dismissed with prejudice except for the retaliation claim concerning the failure to promote her to one of the home health care supervisor positions that is being advanced under Title VII and 42 U.S.C. § 1981. An order consistent with this opinion will be entered contemporaneously herewith.

DONE this the 26th day of April, 1999.

John E. Ott

JOHN E. OTT
UNITED STATES MAGISTRATE JUDGE

24